Your Honor, it's good morning. Mark Garagus for the appellant. The slightly different setting than last time we met, which was at the law school, if I remember, three years ago. Once again, we're back on this case in which it appears to me that I don't need to belabor the standard, but clearly you're supposed to resolve, or the district court was supposed to resolve, all disputes in favor of the non-moving party, which would have been the Partridges, and that was not done. In fact, clearly in the order the district court judge cites, I believe it was Exhibit 35. And Exhibit 35 is the CID interview, which is the first interview that was done. There was no nettlesome plaintiff's lawyers present. It was with the officer. The officer waves his Miranda, he's got his lawyer there, and he proceeds to say, he recounts what happens. He says to Keegan, show me your hands, something to that effect. Keegan raises the gun, puts the muzzle next to his head. He then yells, not once, not twice, drop your gun. And his statement, which is I think roughly within less than two weeks, is once he began to pull the gun away from the head, I felt that he was going to try to take my life, or one of the other officer's lives, to force us into a situation to take his. That's the statement. That is the statement that he gives in the presence of his lawyer within ten days, cited, by the way, in the district court order on page two, where he string cites, his honor string cites, Keegan then moved the gun from his temple and quickly pointed the muzzle in the direction of the officers, and cites Exhibit 35, which, by the way, is in our joint appendix of exhibits on page six, and labeled as Exhibit 35, Ellison CID interview. I don't know where the judge got that. I don't know how he got that. All I know is that the videotape shows something completely different. Now you take that along with the other statements. You've got Davidson, you've got Speer, both of whom say, one of whom says, I was trying to stabilize my feet, and there was an object between us. I had obstructed vision. The other one says, I was behind both of them, I had obstructed vision, I saw the gun, I didn't see whatever else. Mysteriously, the body cam is malfunctioning. They don't have software or some other kind of excuse. But we then also add in, as an added kind of bonus to create and show that there is a disputed issue of material fact, Cyril Wecht, who is a self-described, one of the deans of pathologists in this country, 21,000 autopsies, who says, given the wound, it's highly unlikely that the young man was pointing the gun. And on cross, if you will, by the defense, they say, well, is it anatomically possible? And Dr. Wecht says, yes, it's anatomically possible, highly unlikely. Did Dr. Wecht explain why it was highly unlikely? Highly unlikely because of the positioning. That it would have been, basically, if I could describe it for the rest of you. Positioning of the wound? Because of the wound, through the scapula, that in order, when there's, uncontroverted by, I think, everyone, is that the gun was to the, the muzzle was to the temple. Then the wound here, through the scapula, that is it anatomically possible that you could go like this? I suppose that you could, and that's what he conceded, but that it was not likely. Now, they're not standing in front of each other, counsel. The key word that I finally figured out is bladed. He says he was in a blade position, the officer says that, at least once or twice. So they were standing kind of like they do in boxing or mixed martial arts or police training. MMA would be the closest thing I could think of. Well, and police training, I noticed, too, when you just look up the term. Do you have any idea, suppose that the person who was killed, that the nose part, which is straightforward, do you have any idea what angle, going around from noon to three to six, does anything in this record tell you what angle the police officer was in? The closest thing that would answer that question would be Dr. Weck's testimony, because of the entry and exit. And just to address that, so that there is testimony that he, that the young man, the decedent, was, the testimony is kind of looking at a blank stare, standing next to the river, and that was somewhat, was described as, I think, that was kind of surprised, or looked around to see what it was, to see what was going on. And that, so there would have been a turn. And that fits with not seeing the hands in the beginning. Correct, correct. And then I believe the testimony was the right arm behind the right leg. Right. Now, nobody is asking to second guess the objective observation of the officers or anything else. However, the standard here is summary judgment to be resolved with all favorable inferences to the non-moving party. And that clearly was not done. I would indicate, I think, that what was done here is quite the opposite. We turned the MSJ standard inside out. We basically said, we're going to resolve any inference, or by the uncontroverted, or I think pretty clear testimony of Dr. Weck, we're going to avoid dealing with the fact that the officer himself, the shooter himself, said, I felt that he was going to harm me or the other officers, basically implicating or implying that it was a suicide by cop. Where there is no indication of that. In fact, when he says, show me his hands, he puts the gun to his own head. He doesn't, if it was suicide by cop, obviously, he would have reached out. Now, the other thing is, contrary to the kind of suggestion, if you will, in the motion for summary judgment, this is a young man who's in the woods. His mother has called for help. This is not the other factual situation, one of the cases that they cited. Some guy with a shotgun who's breaking into a house and then turns around and the officer is mistaken as to whether it's pointed at them or not. This is a young man who was told, and I think I had said this before when we were on the appeal of the 12B6, he puts the gun to his head. If he wanted to do suicide by cop or anything else, and we had a discussion, Your Honor, three years ago about was the arc. I remember going through that. We went back through that. Was the arc of the hand in this? There's nothing that suggests that. In fact, it's the opposite. It suggests that this officer who's littered with excessive force, I don't know if he's got 17 of them, and he's killed a number of people and killed a number of dogs and he's now employed somewhere else. I mean, it's a sordid history by this officer. The fact is, and I've argued this before in other 1983-style death cases, the objective officer were the other two officers. The objective officer was Davidson and it was Speer who didn't shoot. And the objective officer is not the officer who's got a dog, Duco, who by his own statement, he says as soon as he saw the gun, he was focused on the dog because the dog did not recognize any threat of the gun. And so you've got somebody who's got a gun out, who's pulling his dog, who sees a suicidal young man, that's the information he's got in his head, and then tells him, drop your gun, drop your gun, and says without a nettlesome plaintiff's lawyer present 10 days after, I felt, felt like there was going to be a threat to myself or the other officers and that's why I shot him. That is not in any way, shape, or form resolving all the inferences to the non-moving party, and it certainly is not objective and I'll reserve 25 seconds if I may. There's no questions. Good morning, your honors. May it please the court, I'm Jenna Adams. I represent the Appalese, the city of Benton, Arkansas, Kyle Ellison, and Kirkland in this lawsuit. I'm here today to ask that this court affirm the district court's ruling for the following reasons. The facts in this case are undisputed. The district court found that when ordered to drop the gun, Keegan Schweigel moved the gun away from his temple and quickly pointed the muzzle in the direction of the officers. Counsel, isn't that contradicted by the very in-depth autopsy report and expert opinion of Dr. Wett, I think you said. Sure. Absolutely not. It is not disputed. Absolutely not. It is not disputed by Dr. Wett's report or testimony. The only reason I did the absolutely is because you asked, you or someone, asked the possibly and entirely possible and all that, and that's certainly not his testimony. Proceed. Well, Dr. Wett's opinion doesn't dispute the officer's testimony that the gun was pointed in their direction because he testified that it was anatomically possible for him to have pointed the gun in their direction. But he also testified it was highly unlikely. Well, that doesn't dispute that it was pointed in their direction. Of course it does. It doesn't. That opinion that it was… If he says it's highly unlikely, why doesn't that create a fact question? Because it's not supported by any evidence in the record. The evidence in the record is that the manner in which the bullet entered in the trajectory shows that it was up, that his arm was up and outward, and it was not anatomically impossible. No, I don't think outward, counsel, I don't think outward's in any of this stuff, is it? You're right. It is still up by the scapula and the bullet. And by the way, he says very awkward, highly atypical, almost unlikely, unnatural testing that any muzzle could be pointed. Doesn't that get you to a trial by an expert? No. A genuine dispute would be for him to say that it was anatomically impossible. Huh. And this is a preponderance standard case in the end? Preponderance of the evidence, so you know what I'm talking about? Yes. Okay. There is no evidence in the record that Keegan did not point the gun at the officers, and thus there is no disputed fact on that issue. Isn't this also, counsel, a credibility case? Because I've watched the interview with Officer Ellison, and boy, it's all his credibility. And sometimes I wonder if he's bound by the chair. I think it would be better if they had him stand up when he was moving around. He's kind of bound by the chair, and when he says it was ablated, and I think the other counsel is about right about the way they were standing. How do you think they were standing? That's the real question I should ask. I don't think the way that they were standing really has any bearing on the facts. Oh, my goodness. Whether you're looking directly with someone at the gun, or whether you're at an angle like this, or whether your feet are ablated. But all three officers testified that the gun was pointed in their direction. And that case law in the Eighth Circuit is very clear, Rogers v. King, Partlow v. Stadler, that the moment that a gun is pointed at someone. I thought one of the officers said they couldn't see anything at the relevant time. You said all three testified? All three. I don't think. Officer Ellison's exact statement was, I gave another order for the subject to drop the gun. He moved the gun away from his head, pointed it towards my direction. I immediately feared for my life and fired three rounds. Sergeant Davidson said, again, I heard Officer Ellison give the command to drop the gun. It was near this time that the man brought the gun from his own temple and moved the muzzle in our direction. Detective Spear said, I could see in his right hand a black handgun held to his head. Officer Ellison and Sergeant Davidson in front of me, I didn't have a clear line of sight to the subject to get a sight picture with my weapon. During this time, I was getting my footing. The subject makes a forward motion with the gun, and I heard three shots. The last one really sounds like credibility. All three said in their interviews that it was pointed in their direction. The reason I said credibility is because he attacks his own credibility. The only thing that is relevant as to whether the use of deadly force was objectively reasonable is the moment that the force is used. It's not anything leading at all. The things that are pointed out by appellants as to what they're calling inconsistent statements by the officers, all of those facts about getting my footing and all of that is immaterial to the moment that the force was used. The moment the force was used, they are all consistent that it was pointed in their direction. The case law holds, Rogers v. King and Partlow v. Stadler out of the Eighth Circuit, that in that scenario, when a gun is pointed at officers, the use of deadly force is objectively reasonable. But Dr. Wecht says it's highly improbable. So why don't we have a fact question? Because he says it's anatomically possible. He doesn't say that it's not possible. There's no evidence that Keegan did not point the gun at the officers. That would be a disputed fact. There is no evidence in the record. I'm not quite understanding why it has to be it's impossible versus it's highly improbable. That opinion is not supported by the evidence, though. The evidence shows that the trajectory of the bullet in which it entered and exited the body shows that it did. Okay, well, that's why I asked Mr. Geragos what was the basis for that opinion. Can you explain why there was no basis for Dr. Wecht's opinion? About the unlikeliness? Yes. He demonstrated during his deposition that what was unlikely was that when the arm is up, he said it would have been awkward to twist your wrist in that manner. Very awkward, Counsel. He says very awkward. Sure. Not just awkward, very awkward. Proceed. And he was talking about the twisting of the wrist. Yes. To point it. That was what he claimed made it unlikely. Given that there are no disputed facts, we ask that the court affirm the district court's holding that Keegan presented an immediate threat to the safety of the officers the moment that he pointed the gun in the direction. Thus, Ellison's use of deadly force was objectively reasonable. As I previously stated, probably the cases most directly on point in this circuit would be Partlow v. Stadler and Rogers v. King. In both cases, it involved suicidal persons who pointed a gun at officers, and this court held in both of those cases that the use of deadly force was objectively reasonable in that circumstance. Appellants also argued in their brief that Keegan was moving the gun away from his head in compliance with Officer Ellison's command. However, even if he was moving the gun to comply, the use of deadly force was still objectively reasonable. Hernandez v. Jarman out of the Eighth Circuit says that Keegan's actual intent would be irrelevant. The correct analysis would be what a reasonable officer could conclude his intentions were at that moment. Here, a reasonable officer in Officer Ellison's position could conclude that when the muzzle was pointed in the direction of the officers, Keegan's intent was to shoot them, or that he posed an immediate threat to the officers. It would have been virtually impossible for Officer Ellison to have known whether Keegan was moving the gun per his commands or whether or not he was pointing it in order to shoot them. While the district court found that there was no constitutional violation, and appellees were entitled to qualified immunity based on the first prong, this court can affirm based on any ground, and we also argue that we would be entitled to qualified immunity based on the second prong. Counsel, doesn't the previous opinion of this court foreclose that? No, because... You're kidding me. It says, Keegan's right to be free from excessive force under these circumstances was clearly established in October 2016. Proceed. That was based on the motion for judgment on the pleadings, and we had to take the facts in the light most favorable to the plaintiff, and the court noted in its opinion that at that time we did not know, we didn't have Ellison's views. We did not know the direction in which the gun was pointed. We now have that answer, and it's undisputed by the record, the evidence in the record. Appellants have not identified any law that would have put the officers on notice that their actions here clearly established law. There's no binding authority from the Eighth Circuit or the Supreme Court at the appropriate level of specificity that an objectively reasonable officer in Ellison's position violates the Constitution by using deadly force here. Appellants cite to no... Basically, appellants cite to no case that it's objectively unreasonable to use deadly force against someone that points a gun at officers. They do, however, point to two cases in support of their argument that it should be reversed, the Wilson v. City of Des Moines and the Henderson v. City of Woodbury. Those simply are not factually similar.  And they actually don't reach... The court didn't reach the merits of either one of those cases, and they did not hold that the use of deadly force was objectively unreasonable. I believe I am out of time. Thank you so much. Thank you, Ms. Adams. Mr. Geragos will give you one minute. Thank you. As I sit here, because I do a fair amount of criminal defense, all I can think of is if I tried to get Dr. Weck's opinion that it was anatomically possible into evidence as an expert opinion as I'm defending somebody, I think most district court judges would laugh me out of the courthouse. So now they're taking the obverse of that or the inverse of that, and they want to say, don't bother. We're going to put aside the credibility calls. We're going to put aside the expert opinion, and we're going to say that he's conceding something is possible, which, by the way, my immediate reaction is objection, speculation, motion to strike. So I think it's clear that this should be reversed. I also guess I'll deal with his honor at the district court. I don't want to be presumptuous if it is reversed, because I don't want to be up here again in three years on a directed verdict. But I'll leave that to your honors, and thank you very much. Very well. Thank you, counsel. We appreciate both counsel's appearance and arguments. The case is submitted, and we'll issue an opinion in due course. Thank you. Thank you.